UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**FILED**
**CLERK**

2:20 pm, May 29, 2018

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

---------------------------------------------------------X

DIVISION 1181 AMALGAMATED TRANSIT
UNION – NEW YORK EMPLOYEES
PENSION FUND and its TRUSTEES,

                    Plaintiffs,

         -v-                                    Case No. 16-cv-2498 (SFJ)(SIL)

B & M ESCORTS, INC.,
SAFE COACH, INC.,
SAFE COACH BUS, INC.,
SAFE COACH, BUS SERVICE, INC.,
VINNY'S BUS SERVICE, INC.,
DiMINO EXPRESS, INC.,
DiMINO BUS SERVICE, INC.,
DiMINO TRANSPORTATION, INC., and
ROBERT DiMINO, individually,

                    Defendants.
---------------------------------------------------------X
FEUERSTEIN, J., Senior District Judge

MEMORANDUM AND ORDER

I.      <u>Introduction</u>

         Plaintiffs Division 1181 Amalgamated Transit Union ("Union") – New York Employees

Pension Fund ("Fund") and its Trustees ("Trustees"; collectively with the Fund, the "Plaintiffs")

move this Court for summary judgment against defendants B&M Escorts, Inc. ("B&M"), Safe

Coach, Inc. ("Safe"), DiMino Express, Inc. ("Express"), DiMino Transportation, Inc.

("Transport"), and Robert DiMino ("DiMino") (collectively, "Defendants") on Plaintiffs'

Complaint brought under the Employee Retirement Income Security Act of 1974 ("ERISA"), as

amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), seeking a

1

judgment awarding delinquent contributions, audit payroll costs, withdrawal liability, interest, liquidated damages, as well a attorneys' fees and costs. (*See* ECF 53; hereafter, the "Summary Judgment Motion" or "Motion".) Defendants oppose the Motion. (*See* ECF No. 54; hereafter, "Opposition".) For the reasons that follow, Plaintiffs' Summary Judgment Motion is granted in part and denied in part.

II.    Background

   *A. General Background*

   Plaintiffs initiated a lawsuit in 2013 against the New York City Department of Education ("DOE") seeking to hold the DOE liable, as an alter ego of certain unionized bus companies for withdrawal liability. *See Division 1181 Amalgamated Transit Union–New York Employees Pension Fund v. N.Y. City Dep't of Educ.*, No 13-cv-9112, 2017 WL 3738741, at *1-2 (S.D.N.Y. Aug. 30, 2017)(hereafter, the "*SDNY Litigation*"). Relevant background provided by Judge Castel in the *SDNY Litigation* provides helpful context to the present dispute:

> This action is brought by . . . [the Fund, . . .] a multiemployer pension plan that provides retirement benefits to New York City school bus drivers and other employees who work in student transportation. The Fund's participants include employees of eleven non-party bus companies[1] that contracted with the [DOE]. In or around 2013, their contracts with the DOE expired and were not renewed. The bus companies each withdrew from the Fund around that time.
>                        * * *
> The DOE is a government entity that provides education to approximately 1.1 million students in New York City [ ] through the operation of approximately 1,600 public schools. Under state law, the DOE is required to award all busing contracts through competitive, sealed bidding.

---

[1]  B&M is one of the eleven bus companies. *See SDNY Litigation*, 2017 WL 3738741, at *2 (internal citations omitted).

The DOE's history with bus contractors is important to an understanding of the Fund's claims. In 1979, following a strike by bus company employees, the DOE reached a negotiated agreement with certain local transit unions. This agreement, known as the "Mollen Agreement," provided for certain employee protection[ provisions ("EPPs")][2] that became standard in DOE busing contracts.

The [EPPs] of the Mollen Agreement remained in place until 2012, following litigation in which some bus companies successfully challenged certain [EPPs] as unlawful.[3] In 2012 and 2013, the DOE solicited bids for new bus contracts that would replace those set to expire in 2013. Numerous companies submitted sealed bids. When the DOE awarded new contracts, they did not contain the [EEPs] that were standard under the Mollen Agreement.

Amid these changes to the contracting landscape, the DOE did not renew its contracts with certain bus companies that had long provided student transportation. . . .

Each of those eleven companies entered into a collective bargaining agreement ("CBA") with [the Union]. The DOE is not a signatory to the CBA, and was not directly involved in its negotiations. Each CBA defines "Employer" as the respective bus company that executed the CBA. The CBA set forth the terms of certain [EPPs] and benefits, and the required employer contributions to fund those benefits.

*SDNY Litigation*, 2017 WL 3738741, at *1-2. DiMino was deposed as a non-party witness in the *SDNY Litigation*. (*See* Ex. 2 (excerpts of deposition transcript), attached to Swyers Decl. (ECF NO. 53-4).)

The Union President and Chairman of the Fund's Board of Trustees, Michael Cordiello, submitted a declaration in the *SDNY Litigation*. (*See* Cordiello Decl., attached as Ex. 1 to Douglas Aff. (ECF No. 54-2).) Among other things, he declared: that inclusion of EPPS in

---

[2] (*See* Cordiello Decl. ("Cordiello Decl.") ¶10, attached as Ex.1 to Douglas Aff. (ECF No. 54-2).)

[3] *See L & M Bus Corp. v. N.Y. City Dep't of Educ.*, 71 A.D.3d 127 (N.Y. App. Div., 1st Dep't 2009), *aff'd as modified*, 17 N.Y.3d 149 (N.Y. 2011).

contracts between the DOE and Union bus companies prevented "any significant decline in the . . . level of incoming contributions to the Fund" (*see* Cordiello Decl. ¶15); that based on the inclusion of EPPs, the Fund sought exemption from ERISA withdrawal liability requirements, which was granted (*see id.* at ¶¶19-20; *see also* Pension Benefit Guaranty Corp. ("PBGC") June 21, 1983 Notice of Approval, 1983 WL 113661 (F.R.) (hereafter, the "1983 Exemption Rule"), attached as Ex. 3 to Douglas Aff.); that in or about 2012, the DOE issued bids for new busing contracts which did not include the EPPS; that "[o]n April 16, 2013, as a result of the DOE's impending entering of contracts that would not contain the EPPs, the Board [*i.e.*, the Plaintiff Trustees] unanimously resolved to amend the Fund's withdrawal liability rules to eliminate the exemption for withdrawal assessments [*i.e.*, the 1983 Exemption Rule]" (*id.* at ¶22; *see also* Fund's "Amendment #1 to Withdrawal Liability Rules" (hereafter, the "2013 Amendment"), attached as Ex. 4 to Douglas Aff.); and that "[a]s a result of the removal of the withdrawal liability exemption [*i.e.*, the 1983 Exemption Rule], the Fund was required to assess and collect withdrawal liability upon the withdrawal of any participating [bus company] from the Fund on or after April 16, 2013." (*Id.* at ¶23.; *see also* Opposition at 3-5.)

   *B. Factual Background*[4]

   It is undisputed that the Fund is an ERISA multiemployer pension plan and was established pursuant to a Restated Agreement and Declaration of Trust (hereafter, the "Trust

---

   [4] The facts herein are taken from the Parties' Local Rule 56.1 statements and counter-statements, declarations, and accompanying exhibits, and are undisputed unless otherwise noted. Hereafter, Plaintiffs' Local Rule 56.1 Statement (*see* ECF No. 53-2) shall be cited as "Pls.' 56.1 Stmt. ¶[#]", Defendants' Local Rule 56.1 Counterstatement (*see* ECF No. 54-1) shall be cited as "Defs.' 56.1 Stmt.¶[#]", and Plaintiffs' Local Rule 56.1 Reply Statement (*see* ECF No. 55-1) shall be cited as "Pls.' 56.1 Reply ¶[#]".

Agreement"). (*See* Pls.' 56.1 Stmt. ¶¶1, 3.) The Trust Agreement is the Trustees' source of

authority for establishing rules and policies relating to, *inter alia*, the collection of Fund

delinquencies. (*See id.* at ¶¶4-9.) Defendants dispute whether the Trustees are fiduciaries of the

Fund within the meaning of ERISA on the basis that "[t]he Fund's Trust Agreement clearly states

that the Fund shall be administered by the Board of Trustees, which it defines as 'those persons

designated in accordance with Article III of this Agreement.'" (Defs.' 56.1 Stmt. ¶2 (quoting

D'Ulisse Decl., Ex. 1 at 2)), but that no individual trustee have been named in this action;

instead, the Plaintiffs are identified as the Fund "and its Trustees". (*See id.*)

DiMino has been in the school bus industry since 1969. (*See* DiMino Aff. ¶7.) In 2000,

he purchased Safe, a non-unionized bus company, and B&M, a unionized company that provides

bus matrons to escort special education children traveling on school buses. (*See* Pls'. 56.1 Stmt.

¶¶11-12; Defs.' 56.1 Stmt. ¶¶11-12.) Both Safe and B&M are owned solely by DiMino; he is

also the one hundred percent owner of Express and Transport. (*See* Pls'. 56.1 Stmt. ¶40; Defs.'

56.1 Stmt. ¶40.) Since 2002, DiMino has owned real property located at 1040 Rockaway

Avenue in Brooklyn, New York (hereafter, the "Rockaway Property"). (*See* DiMino Aff. ¶14;

*see also* Pls'. 56.1 Stmt. ¶41; Defs.' 56.1 Stmt. ¶41.) While Safe operates out of a different

location, it identifies the Rockaway Property as its principal place of business (*see* Answer ¶9)

and uses that Property as its mailing address and as a site where mechanics maintain and inspect

buses operated by Safe; Safe does not pay DiMino for its use of Rockaway Property. (*See*

DiMino Aff. ¶¶15-16; *see also* Defs.' 56.1 Stmt. ¶47.) Similarly, B&M receives its mail at the

Rockaway Property, which it holds out to be its "principal executive office address", and does

not pay DiMino for that use. (*See id.* ¶¶14, 16; *see also* Pls.' 56.1 Stmt. ¶ 45; Defs.' 56.1 Stmt.

¶47.)

Since DiMino's acquisition of Safe and B&M, Safe has had school transportation contracts with the DOE and, in relationship therewith, has utilized B&M bus matrons. (*See* id. ¶4, 6.) On behalf of B&M, DiMino signed a CBA with the Union, which, among other things, obligated B&M to contribute to the Fund. (*See* Pls.' 56.1 Stmt. ¶¶13-15; Defs.' 56.1 Stmt. ¶¶13-15.) There is no dispute that pursuant to the CBA: the Trustees had the authority to audit B&M's books and records (*see id.* at ¶16); B&M was bound to the terms of the Trust Agreement and the delinquency policies adopted by the Trustees (*see id.* at ¶17); there was a set due date for Fund contributions (*see id.* at ¶19) and delinquent contributions were subject to specific interest rates (*see id.* at ¶18); and the Fund was entitled to reimbursement of its costs and fees incurred in its collection efforts (*see id.* at ¶20).

In the Spring of 2013, when the DOE ceased including EPPs in its school transportation contracts, Safe "was free to utilize non-union bus matrons" (Opposition at 7; *see also* Dimino Aff. ¶¶ 17-18), effectively making B&M's existence obsolete (*see* DiMino Aff. ¶18). Thus, on or about June 30, 2014, B&M ceased all operations. (*See id.* ¶18; *but, cf., id.* ¶1 (stating B&M ceased all operations in 2013).) While Defendants dispute it, the Fund determined that B&M's June 30, 2014 cessation had effected a "complete withdrawal" from the Fund, as that term is defined under ERISA (hereafter, the "Withdrawal Date"). (*See* Pls.'s 56.1 Stmt.¶ 30 (citing 29 U.S.C. § 1383); *cf.*, Defs.' 56.1 Stmt. ¶30 (admitting "B&M ceased operations effective on or about June 20, 2104[,] but did not 'withdraw' on that date or any other date given that the Fund's special withdrawal liability rules [*i.e.*, the 1983 Exemption Rule] remain in effect").)

On December 2, 2014, the Fund sent B&M a letter regarding a "Payroll Compliance Engagement Report" and informing B&M that, according to "the Audit Report", it owed the Fund nine thousand, four hundred twenty-two dollars and thirty-nine cents ($9,422.39) in unpaid pension contributions for a period from July 1, 2010 to April 30, 2014, plus an additional five thousand, seven hundred thirty-seven dollars and fifty cents ($5,737.50), to reimburse the Fund for the cost of the audit [hereafter the "Audit Fee"], for a total of fifteen thousand, one hundred fifty-nine dollars and eighty-nine cents ($15,159.89).  (*See id.* ¶¶ 19-20; *see also* Ex. A, attached to DiMino Aff. (Fund's Dec. 2, 2014 letter to B&M (hereafter, the "Pension Letter")).)  The Pension Fund advised B&M that it had four weeks from the date of the Pension Letter to resolve any disputes and demanded payment of undisputed delinquent amounts by January 2, 2015.  (*See* Pension Letter.)

B&M received a separate December 2, 2014 letter from the Union's Welfare Fund, a non-party to this action.  (*See id.* ¶¶ 19, 21; *see also* Ex. B, attached to DiMino Aff. (Welfare Fund's Dec. 2, 2014 letter to B&M (hereafter, the "Welfare Letter")).)  The Welfare Letter informed B&M that, regarding a (different) "Payroll Compliance Engagement Report," the Union's Welfare Fund determined B&M was entitled to a twenty-two thousand, seven hundred sixty-eight dollar and sixty-one cents ($22,768.61) credit.  (*See* Welfare Letter.)  B&M was advised that to receive the credit, it was required to make its request in writing.  (*See id.*)

On behalf of B&M, DiMino

> sent a letter to the Fund on or about December 17, 2014 requesting this refund, taking issue with what the Fund said B&M owed for unpaid contributions, and stating that B&M would be fine with the Fund taking out what B&M may have legitimately owed for unpaid contributions from the amount of the refund the Fund owed B&M

for contribution overpayments and simply issuing a check to B&M
for the difference.

(DiMino Aff. ¶22; *see also* Ex. C, attached to DiMino Aff. (B&M's Dec. 17, 2014 Letter to "Board of Trustees, Division 1181 A.T.U., New York Welfare Fund" (hereafter, "B&M's Response Letter")).)  Plaintiffs contend that in reply to B&M's Response Letter "certain adjustments were made to the Initial Audit Report."  (Pls.' 56.1 Stmt ¶24 (citing "Schedule of Pension Adjustments," attached as Ex. 6 to D'Ulisse Decl.).)  However, DiMino states he never received a reply to B&M's Response Letter or the requested net credit.  (*See* DiMino Aff. ¶23; *see also* Defs.' 56.1 Stmt. ¶24 (stating, *inter alia*, that Ex. 6 offers no context and "B&M never received this document").)  Similarly, as to the issuance of a "Final Audit Report" of an unspecified date, which Plaintiffs assert determined a reduced delinquent contribution amount due, *to wit*, four thousand, two hundred thirty-two and thirty cents ($4,232.30) (*see* Pls.' 56.1 Stmt. ¶25 (citing Ex. 7 (Final Audit Report))), Defendants state: they never received it; it cannot be a final audit report as Plaintiffs admit to making further revisions to it; and since it is not dated, there is no reference point from which payments to be made "within 30 days" can be determined.  (*See* Defs.' 56.1 Stmt. ¶25.)

On June 10, 2015, the Fund sent B&M a letter to the Rockaway Property via certified mail regarding withdrawal liability (hereafter, the "Notice & Demand").  (*See* Pls.' 56.1 Stmt. ¶32; *see also* Ex. 9 (Notice & Demand), attached to D'Ulisse Decl.)  It informed B&M: of the Fund's determination that B&M had completely withdrawn from the Fund; that under ERISA, such withdrawal had created withdrawal liability on the part of B&M and on the part of "any and

all trades or businesses under common control with [B&M] (the "Control Group"[5])"; that in accordance with ERISA, the Fund had calculated the B&M Control Group's withdrawal liability to be one million, two hundred three thousand, seven hundred thirty-six dollars and no cents ($1,203,736.00) (hereafter, the "Withdrawal Liability"); and that the Withdrawal Liability could be paid in a single installment or eighty (80) quarterly installments, with the first installment due no later than sixty (60) days from the date of the Notice & Demand.  (*See* Notice and Demand.) In closing, the Notice & Demand stated:

> Section 4219(c)(2) of ERISA requires that the Control Group start making its scheduled payments by the date indicated above even if the Control Group requests a review or appeals a determination of the amount of the liability or of the schedule set forth above.  If the Control Group fails to make, when due, any payment in accordance with the foregoing schedule and if the failure is not cured within sixty (60) days after the Control Group receives written notification of such failure, the Fund will require immediate payment of the outstanding amount of the liability plus accrued interest on the total outstanding liability from the due date of the first payment which was not timely made.  If the Fund is required to commence a lawsuit to collect any amount due, the Control Group will also be liable for attorney's fees, costs, and liquidated damages.

(Notice and Demand at 2.)  DiMino disputes receiving the Notice & Demand from the Fund or similar letters regarding the Withdrawal Liability in the Summer of 2015 (*see* DiMino Aff. ¶24; *see also* Defs.' 56.2 Stmt. ¶32), noting Defendants have never produced a certified mail receipt proving receipt by DiMino (*see* Defs.' 56.1 Stmt. ¶33).  However, Defendants do not dispute Plaintiffs' further statement that neither B&M nor any other entity made the first quarterly Withdrawal Liability payment, but again noting Plaintiffs failed to produce evidence of delivery

---

[5]  The Court shall refer to the "Control Group" as the "B&M Control Group" which, for discussion purposes, shall encompass B&M, Safe, Express, Transport, and DiMino.

of the Notice & Demand and further noting "there was no basis for any such liability given that the Fund's special withdrawal liability rules [*i.e.*, the 1983 Exemption Rule] remain in effect." (*Id.* at ¶34; *cf.*, Pls.' 56.1 Stmt. ¶34.)

After, failing to receive B&M's first quarter Withdrawal Liability payment, on September 21, 2015, Plaintiffs counsel sent B&M an ERISA-required default letter (hereafter, the "Default Letter") via certified mail to the Rockaway Property. (Pls.' 56.1 Stmt. ¶35; *see also* Ex. 10 (Default Letter), attached to D'Ulisse Decl.) Plaintiffs' counsel informed B&M, *inter alia*, that it had sixty (60) days to cure the default or the entire Withdrawal Liability would become due. (*See* Default Letter; *see also* Pls.' 56.1 Stmt. ¶35.) Defendants dispute receipt of the Demand Letter and, again, note the lack of evidence of a certified mail receipt and the lack of a basis to impose the Withdrawal Liability. (*See* DiMino Aff. ¶25; *see also* Defs.' 56.1 Stmt. ¶35.)

It is undisputed that neither B&M nor any other entity made the demanded first quarter Withdrawal Liability payment within the 60-day cure period (*see* Pls.' 56.1 Stmt. ¶36; Defs.' 56.1 Stmt. ¶36) or that any amount of B&M's Withdrawal Liability has been paid, which Plaintiffs claim remain due and owing (*see* Pls.' 56.1 Stmt. ¶37; Defs.' 56.1 Stmt. ¶37). Plaintiffs contend the B&M Control Group did not seek review of the Funds' Withdrawal Liability determination within the ERISA-defined 90-day time-period (*see* Pls.' 56.1 Stmt. ¶38), which Defendants dispute because they maintain the Notice & Demand was never received (*see* Defs.' 56.1 Stmt. ¶38). However, Defendants do not dispute Plaintiffs' statement that the B&M Control Group did not initiate any arbitration proceedings pursuant to ERISA's withdrawal liability dispute resolution provisions (*see* Pls.' 56.1 Stmt. ¶39; Defs.' 56.1 Stmt. ¶39).

DiMino also denies receiving any letter from the Fund claiming he is individually liable to the Fund for the Withdrawal Liability. (*See* DiMino Aff. ¶26). Rather, he states he first became aware of the Fund's Withdrawal Liability claims in July or August 2016, when he was subpoenaed to provide deposition testimony in the *SDNY Litigation*. (*See id.* ¶27.)

### C. *Procedural Background*

On May 17, 2016, Plaintiffs commenced this action. (*See* Complaint, ECF No. 1) Defendants answered the Complaint on August 11, 206. (*See* ECF No. 9, Answer.) Then, on March 23, 2017, Defendants commenced a third-party complaint against the DOE (*see* ECF No. 31, Third-Party Complaint), which, on July 13, 2017, the DOE moved to dismiss.[6] (*See* ECF No. 45, Dismissal Motion.) On August 3, 2017, Plaintiffs filed the instant Summary Judgment Motion.

#### 1. Plaintiff's Summary Judgment Arguments

Plaintiffs assert that B&M is an "employer" under the MPPAA and, pursuant to its CBA with the Union, was obligated to contribute to the Fund. (*See* Pls.' Memo. Supp. Summary Judgment Motion (ECF No. 53-1; hereafter, "Support Memo") at 10.) They also contend that B&M waived its right to challenge the withdrawal liability assessment against it because it neither timely disputed the Funds assessment nor demanded arbitration; hence, "the withdrawal liability assessment becomes final and binding, and is not subject to judicial review." (*Id.* at 11 (collecting cases); *see also id.* at 12.) Further, since B&M failed to make its initial Withdrawal Liability quarterly payment or timely cure its arrearage, the entire assessed amount is now due. (*See id.* at 12-13.) Moreover, they claim Safe, Express, and Transport are jointly-and-severally

---

[6] The Court will address the Dismissal Motion by a separate memorandum and order.

liable for all amounts owed by B&M because the evidence demonstrates a "brother-sister" relationship between them and B&M, thereby rendering them part of the B&M Control Group and imposing liability on all members of the Group. (*See id.* at 13-15.) Relatedly, since DiMino is the one-hundred-percent (100%) owner of B&M and of the other B&M Control Group members and the one-hundred-percent (100%) owner of the Rockaway Property used by B&M and Safe, and notwithstanding that he does not receive rent from them, he too is considered a member of the B&M Control Group, making him equally liable to the Fund (*see id.* at 16-18). Plaintiffs seeks damages pursuant to the audit performed by the Fund (*see id.* at 19-21), as well as for the assessed Withdrawal Liability, together with related interests and costs (*see id.* at 21-22).

### 2. Defendants' Arguments Opposing Summary Judgment

In opposition, Defendants raise six arguments. First, they contend that the Fund's claim of withdrawal liability is based on an inoperative amendment to the Funds' 1983 Exemption Rule. (*See* Opposition at 11-13.) Second, they argue the Plaintiffs lack standing under ERISA to pursue a withdrawal liability claim. (*See id.* at 13-14.) Third, Defendants assert that the Plaintiffs cannot collect from DiMino, individually, because there are no special circumstances warranting individual liability. (*See id.* at 14-21.) Fourth, Defendants' dispute regarding receipt of notices of demand from the Plaintiffs raise a material issue of fact precluding the granting of summary judgment. (*See id.* at 21.) Fifth, there are also material factual disputes as to whether Plaintiffs are entitled to delinquent contributions from B&M. (*See id.* at 21-24.) Finally, Defendants argue that they did dispute an audit report provided by the Fund and requested a credit for overpayments that exceeds any delinquencies owed. (*See id.* at 24-25.)

### 3. Plaintiffs' Reply

Plaintiffs challenge each of Defendants' arguments. (*See* ECF No. 55; hereafter, "Reply".) They refute Defendants' first argument on two bases: a challenge to a fund's assessment of withdrawal liability must be presented to the arbitrator in the first instance, and since Defendants did not do so, they are bound by the Fund's Withdrawal Liability determination (*see* Reply at 2-4); and, under the applicable regulations, the Fund did not need prior approval to repeal the 1983 Exemption Rule which made the Fund subject to the general statutory withdrawal rules (*see id.* at 4-5). Plaintiffs challenge Defendants' standing arguments, claiming that: Defendants waived their standing argument, having failed to timely raise it (*see id.* at 6-8); in any event, as fund fiduciaries, the Trustees have the requisite standing to bring this action notwithstanding that they were not individually named (*see id.* at 8-11); and, alternatively, that the Court could join the Fund's Chairman as a plaintiff and enter summary judgment (*see id.* at 11-13). Regarding DiMino's personal liability arguments, Plaintiffs claim: DiMino's ownership of the Rockaway Property used rent-free by B&M and other members of the B&M Control Group renders DiMino a member of that controlled group and jointly-and-severally liable for the Withdrawal Liability (*see id.* at 14-17); and regardless whether B&M used the subject property, since Safe used the Rockaway Property and Safe was a member of the B&M Control Group, thereby also rendering it to be an employer for ERISA purposes, DiMino is personally liable for the Withdrawal Liability (*see id.* at 17-18). As to Defendants' fourth argument, Plaintiffs contend that "that a simple review" of Defendants supposed argument "shows that they do not dispute that [Safe, Express, and Transport] are members of the B&M Control Group" (*id.* at 18); hence, they are jointly and severally liable with B&M for its Withdrawal Liability, as well as

related liability. (*See id.* at 19.) Further, Plaintiffs would have the Court discount Defendants' notice argument for three reasons: Plaintiffs' assert Defendants did not deny in their Answer receipt of notices from the Fund (*see id.* at 19-20); the Funds' notices should be deemed received by B&M and DiMiro since they were sent by certified mail to B&M's last known address, thereby complying with the MPPAA's notice requirements (*see id.* at 20-21); and, in any event, service of the Complaint placed the Defendants on notice of the Funds' claims, and that was sufficient to notify both corporate and individual defendants (*see id.* at 21-22). Regarding the delinquent contributions, Plaintiffs raise two final counter-arguments: Defendants' claim of a credit involved the Union's welfare plan, a non-party benefit plan, and not the Pension Plan, one of the Plaintiffs herein; and, in any event, Plaintiffs are not required to deliver a final audit report to the Defendants since all ERISA requires is proof that B&M failed to make contributions required by the subject CBA, which Plaintiffs have shown and Defendants have not refuted (*see id.* at 24-25).

III.    Discussion

   *A. Motion for Summary Judgment Standard*

   Pursuant to Federal Rule of Civil Procedure 56, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015); *Kwong v. Bloomberg*, 723 F.3d 160, 164-65 (2d Cir. 2013); *Viola v. Philips Med. SYS. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994) (holding summary judgment appropriate only where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one

party's entitlement to judgment as a matter of law). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the nonmovant, that no rational jury could find in the nonmovant's favor. *See Chertkova v. Conn. Gen'l Life Ins., Co.*, 92 F.3d 81, 86 (2d Cir. 1996). Although the evidence is viewed in favor of the non-moving party, *see Willey v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015), "the mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the [fact-finder] could reasonably find for the [non-movanat]." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005)(internal alterations and quotation marks omitted). It is insufficient to "rely on conclusory allegations or unsubstantiated speculation" to defeat a summary judgment motion. *Id.* (Internal quotation marks omitted). Instead, when the moving party has documented particular facts in the record, "the opposing party 'must set forth specific facts showing that there is a genuine issue for trial,'" *Willimas v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986)(quoting Fed. R. Civ. P. 56(e)), which requires going beyond the allegations of the pleadings. *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (citation omitted).

### B. Unpaid Contributions

Pursuant to § 1145 of ERISA:

> [e]very employer who is obligated to make contributions to a
> multiemployer plan under the terms of the plan or under the terms
> of a collectively bargained agreement shall, to the extent not
> inconsistent with law, make such contributions in accordance with
> the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145; *see also Finkel v. Triple A. Group, Inc.*, 708 F. Supp.2d 277, 281 (E.D.N.Y. 2010) (adopting report and recommendation). Relatedly, the statute "sets forth the damages that

are recoverable for an employer's failure to remit contributions as required by Section 515 of ERISA." *Finkel v. Universal Sec. Sys., Inc.*, No. 10-cv-4520, 2011 WL 5402070, at *3 (E.D.N.Y. Sept. 9, 2011)(R. & R.)(quoting 29 U.S.C. § 1132(g)(2) (identifying interest, additional interest or liquidated damages, reasonable attorney's fees and costs, other legal or equitable relief as deemed appropriate by the court)), *adopted by*, 2011 WL 5403080 (E.D.N.Y. Nov. 4, 2011). In addition, if a complaint puts a defendant on notice, a court "may also award damages that have accrued while the lawsuit is pending." *Id.* (citing *Triple A. Group*, 708 F. Supp.2d 277, 282).

  *C. Withdrawal Liability Cause of Action*[7]

>    Generally, where a plan sponsor seeks withdrawal liability payments, it must "show only that it complied with statutory procedural requirements." *See Trustees of Amalgamated Ins. Fund v. Steve Petix Clothier, Inc.*, No. 03 Civ. 4530, 2004 WL 67480, at *2 (S.D.N.Y. Jan. 15, 2004); *[Bowers v.] Transportes Navieros Ecudorianos (Transnave)*, 719 F. Supp. [166,] 172 [(S.D.N.Y. 1989)]. Thus, "[t]he plan sponsor must: (1) determine that an employer has partially or completely withdrawn from a multiemployer plan; (2) determine the amount of the employer's withdrawal liability; (3) notify the employer of the amount of liability and the payment schedule; and (4) demand payment according to the schedule."

*D&A Bus Company*, 270 F. Supp.3d at 608-09 (quoting *Steve Petix Clothier*, 2004 WL 67480, at *2); *see also Ret. Plan of Nat. Ret. Fund. v. Lackmann Culinary Servs., Inc.*, No. 7:10-cv-6316, 2011 WL 3366354, at *3 (S.D.N.Y. July 29, 2011) (same); *Nat'l Integrated Grp. Pension Plan v. Dunhill Food Equip. Corp.*, 938 F. Supp.2d 361, 366 (E.D.N.Y. 2013) ("In order to prevail on

---

  [7] For a general discussion of the law of withdrawal liability, *see Division 1181 Amalgamated Transit Union–New York Employees Pension Fund and its Trustees v. D&A Bus Company, et al.*, 270 F. Supp.3d 593, 606-08 (E.D.N.Y. 2017)(adopting report and recommendation).

summary judgment, a plaintiff must establish three elements: (1) that defendants constituted an 'employer' under MPPAA prior to the withdrawal; (2) that defendants received notice of the withdrawal liability assessment against them; and (3) that defendants failed to initiate arbitration as required by MPPAA." (internal quotation and citation omitted)); 29 U.S.C. §§ 1382, 1399(b)(1).

Further, "[u]nder ERISA, a plan may accelerate withdrawal liability in the event of a default." *Nat'l Pension Plan of the UNITE HERE Workers Pension Fund v. Swan Finishing Co., Inc.*, No. 05-cv-6819, 2006 WL 1292780, at *3 (S.D.N.Y. May 11, 2006) (citing 29 U.S.C. § 1399(c)(5) ("In the event of a default, a plan sponsor may require immediate payment of the outstanding amount of an employer's withdrawal liability . . . .")). One event of default is when an employer does not cure its failure to pay an installment of its withdrawal liability obligations within sixty (60) days after notification of such failure. *See id; see also* ERISA § 1399(c)(5)(A). Default may also include "any other event defined in rules adopted by the plan which indicates a substantial likelihood that an employer will be unable to pay its withdrawal liability." 29 U.S.C. § 1399(c)(5)(B).

### D. The Instant Summary Judgment Motion

#### 1. Standing of the Fund's Trustees to Bring Suit

There is no dispute that the individual trustees who comprise the Fund's Board of Trustees were not named in the Plaintiffs' Complaint; instead, the Fund identified its co-Plaintiffs simply as "its TRUSTEES". (*See* Complaint caption at 1; *see also id.* at ¶6.) While scant, this technically complies with Rule 10(a)'s requirement that "[t]he title of the complaint must name all the parties," Fed. R. Civ. P. 10(a), since Rule 10(a) does not direct the manner in

which parties are to be named.  *Cf.*, *e.g.*, Fed. R. Civ. P. 17(a), (d).

To the extent the Defendants' challenge the Trustees' standing, it is an attack on the Trustees' statutory standing.  (*See* Opposition at 13.)  In that regard, the Defendants have waived that argument, having failed to include it as an affirmative defense in its Answer (*see* Answer ¶¶128-135).  *See generally Canzoneri v. Inc. Vill. of Rockville Ctr.*, 986 F. Supp.2d 194, 200 (E.D.N.Y. 2013) (finding a challenge to statutory standing waived where it was not raised as an affirmative defense); *see also Mhany Mgmt. v. Inc. Vill of Garden City & Garden City Bd. of Trustees*, 985 F. Supp 390, 411 (E.D.N.Y. 2013) ("Statutory standing arguments, unlike constitutional standing arguments, can be waived.")(citing *Gribben v. United States (In re Gribben)*, 158 B.R. 920, 921-22 (S.D.N.Y. 1993)).  Indeed, Defendants waited more than a year to make this argument, notwithstanding that the Complaint informed them that the Trustees brought this action in their representative capacities on behalf of the Fund.  (*Cf.*, Complaint ¶6 (filed May 17, 2016), *with* Opposition at 13-14 (filed August 3, 2017).)  This time lapse "indicates that the absence of the [T]rustees' personal names did not prevent [the Defendants] from appreciating the substance of the claims being made against [them]."  *Boilermaker-Blacksmith Nat'l Pension Trust v. Reed (In re Reed)*, Case No 02-10109-7, Adv. Pro. No. 02-6028, 2004 Bankr. LEXIS 1429, at *4 (Bankr. D. Kan. Sept. 14, 2004).  Nor is it a basis upon which to grant them summary judgment.

### 2.  Unpaid Contributions Identified after Payroll Audit

The Plaintiffs did not initially address their claim against B&M for unpaid contributions, and associated interest, fees, and costs.  Defendants did, however, asserting the existence of "a substantial factual dispute with respect to the existence and amount of the alleged delinquent

contributions that Plaintiffs seek to collect from B&M." (Opposition at 25.) In reply, Plaintiffs

contend they need only "prove that B&M failed to make contributions as required by its CBA."

(Reply at 24 (citing ERISA § 502(g)(2).)

The Fund's "Policy for Collection of Delinquent Contributions" (hereafter, "Collection

Policy") provides guidance regarding its claim for unpaid contributions. (*See* Collection Policy,

*attached as* Ex. 2 to D'Ulisse Decl.) Pursuant to the Collection Policy, the Fund is required to

initially provide an employer with written notice of its payroll audit findings and to provide the

employer with a four (4) week period to challenge those findings. (*See id.* at §4(9), (10).) If an

employer disputes the findings, it must do so in writing and the Fund "will endeavor in good

faith to resolve all disputes regarding the audit." (*Id.*) In such an event, the Fund "*will respond

in writing* with either an adjustment to the final amounts reflecting the Employer's comments or

an explanation as to why the findings in the final auditor report are correct." (*Id.* (emphasis

added).) Nonetheless, an "[e]mployer must remit payment of all contributions not specifically

disputed, with interest thereon and audit fees, within four weeks of the date of the payroll audit

notice." (*Id.*)

Here, in a timely response to the Fund's written notice of its payroll audit, B&M wrote to

the Fund disputing some of its findings, *to wit*:

> *The audit* for the period July 1, 2010 to April 30, 2014 *shows* that
> the company [*i.e.*, *B&M*] *owes the Pension Fund* of 1181
> $7,572.80 plus interest. *I request that the charges* for employees
> [X] and [Y] *be adjusted* as follows: [X] claimed an injury and
> never returned to work after December 2012[;] therefore the
> employee charge should be reduced by $715.00 and the employer
> charge should be reduced by $1,636.80 for the charges of January
> 2013 through June 2013[,] and [Y] quit in October 2013[,] never
> returning to work and the charges for the November 2013 through

April 2014 should be removed, those being employee contribution of $747.00 and the employer contribution of $1,488.00 *for a total reduction of $4,587.30. That would leave a balance of $2,985.50 owed the Pension Fund and the $5,737.50 [the Audit Fee identified in the Pension Letter] for a total of $8,723.00* [hereafter, the "Adjusted Total"].

(B&M's Response Letter (emphasis added).) B&M's Response Letter belies Defendants' argument that there is a dispute as to the existence of unpaid contributions. At a minimum, the Letter evinces B&M's admission to the existence of two thousand, nine hundred eighty-five dollars and fifty cents ($2,985.50) in contributions liability. Nor is there a dispute that B&M did not pay this undisputed amount by January 2, 2015, the four-week payment deadline after notice of the auditor's findings. (*See* Pension Letter.)

However, as to any additional unpaid contributions due, that is a material disputed issue. Plaintiffs' subsequent schedules, submitted to establish the amount of adjusted delinquent contributions due, lack sufficient context to connect them to the Fund's Initial Audit Report. (*See* Ex. 6 (undated "Schedule of Pension Adjustments"), attached to D'Ulisse Decl.; Ex. 7 (pages 3-4 of undated "Interest Calculations Due" table, which noted "Interest is calculated monthly at 1% through February 29, 2016")). Further, the evidence offered in support of the Plaintiffs' "Final Audit Report" is unpersuasive because nothing identifies it as such (*see* Ex. 7), and its purported finality is called into questions by the Fund's Director's statement that "[t]here are a few items in the Final Audit Report that have been updated since it was issued" (D'Ullisse Decl. ¶27)(noting the issuance date of the Final Audit Report is not identified). Moreover, there is no evidence that, as required by its Collection Policy, the Fund responded in writing to B&M's Response Letter with an adjusted amount due.

Finally, as to the Audit Fee, neither its existence nor its amount can be in contention as shown by B&M's undisputed acknowledgment of both. (*See* B&M's Response Letter.) As a matter of law, therefore, Plaintiffs are entitled to summary judgment in their favor for the Audit Fee.

### 3. Withdrawal Liability

#### (a.) Notice; Waiver of Arbitration; Withdrawal Liability Determined

It is well-settled in the Second Circuit that "'any dispute' concerning the notice or amount of withdrawal liability '*shall* be resolved through arbitration.'" *Bowers v. Transportes Navieros Ecudorianos (Transnave)*, 901 F.2d 258, 262 (2d Cir. 1990) (quoting 29 U.S.C. § 1401(a)(1)); emphasis added). Defendants have denied Plaintiffs' allegations that B&M received the Notice & Demand (*see* Answer ¶ 31 ("Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation contained in [Complaint] paragraph 31) or that it received the Default Letter (*see id.* ¶35 (same)). *See* Fed. R. Civ. P.8(b)(5) ("A party that lacks knowledge or information sufficient to form a belief about the truth of an allegation must so state, and *that statement has the effect of a denial.*" (emphasis added)). They also argue that despite Plaintiffs' representations that both those letters were sent by certified mail, Plaintiffs failed to produce corresponding receipts which would prove delivery to DiMino on behalf of B&M. Relying on *Miller v. Collectron Corporation*, No. 98-cv-2221, 1999 WL 730981 (E.D.N.Y. Sept. 16, 1999), Plaintiffs contend that "sending such notices by certified mail to an employer's last known address satisfies MPPAA's notice requirements." (Reply at 20.) However, given the procedural and factual distinctions between *Miller* and the present case, the Court is not persuaded.

The *Miller* court was presented with a motion to set aside a default judgment and a motion to quash subpoenas. *See* 1999 WL 730981, at *1. As in this case, prior to the commencement of the *Miller* action, the pension fund had sent the defendant-employer a notice and demand letter regarding withdrawal liability (hereafter, "Notice") by certified mail. *See id.* at *2. The record did not indicate whether the corresponding mail receipt was returned. *See id.* However, the pension fund also sent a copy of the Notice to the employer's counsel who had represented the employer in prior dealings with the pension fund and who was representing the employer on the motions. *See id.* The attorney acknowledged receipt of the Notice, but stated he was not authorized to accept service on behalf of the employer. *See id.* Thus, notwithstanding that the pension fund sent its Notice by certified mail to the employer's last known address, which the court observed "appear[ed]" to comply with ERISA's § 1399(b)(1) notice requirement, "[a]ny doubt regarding the sufficiency of the Notice [wa]s allayed by the fact that [the employer's] counsel . . . received a copy of the Notice." *Id.* at *6. That, in conjunction with the attorney's "evasive response to the Notice" and the employer's lack of denial that its counsel had received the Notice, persuaded the court "that plaintiffs fulfilled their § 1399(b)(1) obligation to notify [the employer] of withdrawal liability." *Id.* Hence, the court found the employer could not succeed on its Rule 60(b)(1) motion to set aside the judgment. *See id.*

The *Miller* court's finding of apparent compliance with ERISA's withdrawal liability notice was made in the context of examining one of three criteria to be considered when deciding a Rule 60(b)(1) motion to set aside a judgment. *See id.* at *4. A fair reading of *Miller* makes clear that it was a culmination of several factors, not present here, which persuaded the judge to find the pension fund properly notified the employer of its withdrawal liability. Given the

distinguishing facts of *Miller*, Plaintiffs' reliance on it in this instance is attenuated.

However, there is no dispute here that Defendants were served with the Complaint as evidenced by their filing an Answer thereto.  (*See* Answer, ECF No. 9 (filed Aug. 11, 2016).)  Courts in the Second Circuit have recognized "'that the filing of a civil complaint can constitute sufficient notice under [ERISA] § 1399.'"  *Labarbera v. United Crane and Rigging Servs.*, Nos. 08-cv-3274, 08-cv-3983, 2011 WL 1303146, *3 (E.D.N.Y. Mar. 2, 2011)(quoting *Amalgamated Lithographs of Am. v. Unz & Co., Inc.*, 670 F. Supp.2d 214, 225 (S.D.N.Y. 2009); collecting cases).  Such service is sufficient whether the defendant is a corporation or an individual, *see id.* at *4; *see also Bd. of Trs. of Trucking Emp. of No. Jersey Welfare Fund v. Canny*, 900 F. Supp. 583, 591 (N.D.N.Y. 1995), and may be "sufficient notice to trigger the arbitration requirement" if the complaint contains "the amount of the assessment, the schedule of payments, and the demand for payment."  *Canny*, 900 F. Supp. at 591, 592 (citing *Bowers*, 901 F.2d at 261).  Moreover, "[f]or purposes of notifying control group members of withdrawal liability, '[n]otice as to one member . . . is considered as notice to all members.'"  *Trs. of Local 813 Pension Trust Fund v. Canal Carting, Inc.*, No. 12-cv-60, 2014 WL 843244, at *11 (E.D.N.Y. Mar. 3, 2014 (quoting *Trs. of Amalgamated Ins. Fund v. Saltz*, 760 F. Supp. 55, 58 (S.D.N.Y. 1991)).

Here, the Complaint contained the assessed Withdrawal Liability amount, the schedule of payments, and a demand for payment.  (*See* Complaint ¶32 (Withdrawal Liability assessment (*i.e.*, $1,203,736.00); schedule of payment (80 quarterly payments of $26,478.22 with first payment being due by August 9, 2015, and subsequent payments to be made quarterly thereafter); *id.* at 22-23, ¶(b)(i)-(iv) (demand for payment ("WHEREFORE, the Fund requests a judgment against Defendants, jointly and severally, for all amounts due to the Fund at the time this cause

reaches judgment . . ." including Withdrawal Liability)); *see also* Count II (re: B&M), Count III

(re: Safe), Count VI (re: Express), Count IX (re: Transport), and Count X (re: DiMino); *see also*

Pls.' 56.1 Stmt. ¶37 ("Neither B&M nor any other entity has paid any amounts towards B&M's

[W]ithdrawal [L]iability, the entire amount of which – $1,203,736.00 in principal – remains due

and owing."; Defs.' 56.1 Stmt. ¶ 37 ("Do not contest but further note that for the reasons stated in

Defendants' memorandum of law no such [W]ithdrawal [L]iability exists as to any of the

Defendants."); *see also* DiMino Aff. ¶27 ("I had no clue about this concept of withdrawal

liability until around July-August of last year [*i.e.*, 2016] when I saw the present lawsuit that the

Fund filed against B&M, Safe Coach, myself, and other entities, and around the same time I was

subpoenaed to provide deposition testimony in the Fund's separate lawsuit against the DOE for

withdrawal liability [*i.e.*, the *SDNY Litigation*]. Once I reached out for and found a lawyer, he

explained withdrawal liability to me and that the Fund had assessed withdrawal liability against

B&M.").) Under Second Circuit case law, Plaintiffs' Complaint provided sufficient § 1399

notice thereby triggering the time period within which Defendants had to seek review and

arbitration. *See Bowers*, 901 F.2d at 263. There is no evidence that after service of the

Complaint the Defendants sought Fund review of the assessed Withdrawal Liability. Moreover,

it is undisputed that Defendants never sought arbitration. (*See* Pls.' 56.1 Stmt. ¶39 ("Neither

B&M nor any other entity initiated arbitration within the requirements of ERISA . . ."; Defs.'

56.1 Stmt. ¶ 37 ("Do not contest but further note that for the reasons stated in Defendants'

memorandum of law no such [W]ithdrawal [L]iability exists as to any of the Defendants.").)

Defendants' inaction in that regard has dire consequences.

> "ERISA requires that *all* disputes arising out of a determination made under the withdrawal liability sections must be arbitrated." *Rao v. Prest Metals*, 149 F. Supp.2d 1, 6 (S.D.N.Y. 2001); *see* 29 U.S.C. § 1401. *The dispute here concerning whether Defendant has withdrawn from the Pension Fund is a factual dispute within the scope of the MPPAA that must be arbitrated under ERISA. Id.*
>
> * * *
>
> Indeed, " '[w]here a defendant does not initiate arbitration, it waives its right to arbitration and its right to assert any defenses in an action seeking withdrawal liability' and the 'withdrawal liability assessed against the defendant becomes fixed.' " *National Integrated Group Pension Plan v. Dunhill Food Equipment Corp.*, 938 F. Supp.2d 361, 366 (E.D.N.Y. 2013)(quoting *Finkel v. Fred Todino & Sons, Inc.*, 2010 WL 4646493, at *4 (E.D.N.Y. Oct. 8, 2010)). *Here, by failing* to request a review within 90 days of the demand or *to submit the issue of whether it actually withdrew from the Pension Fund to arbitration, Defendant waived its right to contest both the determination that it had withdrawn and the amount owed in the withdrawal liability*.

*Finkel v. Athena Light & Power, LLC*, No. 14-cv-3585, 2016 WL 4742279, at *5 (E.D.N.Y. Sept. 11, 2016) (emphasis added); *see also Bowers*, 901 F.2d at 263 (holding employer-defendant in ERISA action who did not timely seek arbitration of withdrawal liability assessment upon notification of same by commencement of the action waived right to arbitration by waiting until after a determination on the merits)(collecting cases); *D&A Bus Company,* 270 F. Supp.3d at 612-13 ("failing to timely request arbitration within the statutory timeframe provided by ERISA, . . . [defendant] has waived its right to interpose defenses concerning the imposition of withdrawal liability as well as the overall amount calculated by the plan sponsor")(collecting cases).

Thus, notwithstanding Defendants' assertions that they did not receive the Notice & Demand, there is no material dispute: that Defendants were served the Complaint; that the

Complaint contained the requisite ERISA information necessary to put the Defendants on notice of the Withdrawal Liability, including that the Withdrawal Liability has been accelerated; and that Defendants never requested arbitration.  Accordingly, the Defendants have waived their right to interpose their proffered defenses against the imposition of the Withdrawal Liability, as well as the overall amount calculated by the Fund.  *See D&A Bus*, 270 F. Supp.3d at 612-13 (collecting cases).

### (b.)  Common Control

#### (i.)  The applicable law

> Under the MPPAA, "all businesses under common control are treated as a single employer for purposes of collecting withdrawal liability, and each is liable for the withdrawal liability of another." *Ret. Plan of UNITE HERE Nat'l Ret. Fund. v. Kombassan Holding A.S.*, 629 F.3d 282, 285 (2d Cir. 2010) (quoting *Corbett v. MacDonald Moving Servs.*, Inc., 124 F.3d 82, 86 (2d Cir. 1997)); *see* 29 U.S.C. § 1301(b)(1) ("[a]ll employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer."); *Canney*, 900 F. Supp. at 589 ("Because a commonly controlled group of trades or businesses is to be treated as a single employer, each member of such a group is liable for the withdrawal of any other member of the group.").

*Dunhill Food*, 938 F. Supp.2d at 367.

> "In order to impose withdrawal liability on an organization other than the one obligated to the pension fund, two conditions must be satisfied: the second organization must be[:] (1) under common control with the obligated entity; and (2) a 'trade or business.'"  [*UFCW Local One Pension Fund v. Enivel Props., LLC*, 791 F.3d 369, 371 (2d Cir. 2015)] (citing 29 U.S.C. § 1301(b)(1)).  As to the first requirement, "common control" can be established where entities are members of a "brother-sister" group of businesses under common control, which requires that they are "controlled by the same five or fewer persons owning at least 80%

26

of the shares of each corporation, with at least 50% of the shareholder's ownership interests in each corporation identical." *I.L.G.W.U. Nat'l Ret. Fund v. ESI Grp., Inc.*, No. 92-CV-0597, 2002 WL 999303, at *5 (S.D.N.Y. May 15, 2002) (citing 26 C.F.R. § 1.414(c)–2), *aff'd sub nom. I.L.G.W.U. Nat'l Ret. Fund v.Meridith Grey, Inc.*, 94 F. App'x 850 (2d Cir. 2003); *see Cent. States v. Complete Pers. Sols.*, LLC, No. 13-CR-1091, 2015 WL 1015440, at *3 (W.D.N.Y. Mar. 9, 2015)(explaining the requirements of satisfying common control for "brother-sister" businesses); *Nat'l Integrated Grp. Pension Plan v. Dunhill Food Equip. Corp.*, 938 F. Supp.2d 361, 367 (E.D.N.Y. 2013 (same).

*Trs. of Local 813 Pension Tr. Fund v. Frank Miceli Jr. Contracting, Inc., et al., No.*, 13-cv-198, 2016 WL 1275041, at *3 (E.D.N.Y. Mar. 31, 2016).

Regarding the second condition: In determining whether another organization is a "trade or business" such that it should be considered a member of a controlled group, courts begin with the test articulated by the Supreme Court in *Commissioner of Internal Revenue v. Groetzinger*, 480 U.S. 23 (1987), which defined those terms within the context of the Internal Revenue Code. *See Dunhill*, 938 F. Supp.2d at 372 ("The MPPAA does not define 'trade or business' but incorporates the Internal Revenue Code standard for determining whether two related corporations are under common control." (citing 29 U.S.C. § 1301(b)(1)) (collecting cases). "Under *Groetzinger*, in order to be engaged in a trade or business, 'the taxpayer must be involved in the activity *with continuity and regularity* and . . . the taxpayer's primary purpose for engaging in the activity must be for income or profit.'" *Id.* at 373 (quoting *Groetzinger*, 480 U.S. at 35; emphasis added). In conjunction therewith, courts are also to keep in mind the purpose of the MPPAA's control group rule, which "'is to prevent a company from avoiding liability by shifting its assets into other businesses under its control.'" *Id.* at 373 (quoting *ILGWU Nat'l Ret. Fund. v. Minotola Indus., Inc.*, No. 88-cv-9131, 1991 WL 79466, at *3-4 (S.D.N.Y. May 3, 1991); further

citations omitted).

In *Dunhill*, the evidence demonstrated that two alleged common-control-entities had ceased operating before the defendant-employer's withdrawal from a pension fund. 938 F. Supp.2d at 373. Further, there were no allegations that assets of those entities were shifted or hidden to avoid withdrawal liability. *See id.* Therefore, the *Dunhill* court found that, at the time of the defendant-employer's withdrawal, the other entities were effectively dissolved such that they were no longer members of the defendant-employer's commonly controlled group. (*See id.*)

*(ii.) The instant case*

In this case, there is no dispute "that DiMino is the sole, 100% owner of each of" B&M, Safe, Express, and Transport. (Pls.' 56.1 Stmt ¶40; *see also* Defs.' 56.1 Stmt. ¶40). Nor is it disputed that DiMino is the President of Safe and B&M, with B&M having ceased all operations on or about June 30, 2014 (*see* DiMino Aff. ¶¶1, 18). The record includes DiMino's sworn statements that he is also the President of Express, which "has not been in operation for at least the past 15 years" (*id.* at ¶1), as well as President of Transport, "an entity that has not been in operation for at least the past 5 years" (*id.*).

Re: Safe

The record establishes that Safe is a brother-sister entity to B&M, as both it and B&M are under the control of DiMino, who is sole owner and President of both entities, *see supra*; *see also UNITE Nat'l Ret. Fund v. Veranda Mktg. Co.*, No. 04-cv-9869, 2009 WL 2025163, at *5 (S.D.N.Y. July 13, 2009)(where an individual was the sole owner of various businesses, those businesses were a "brother-sister" group under the individual's common control), and Safe is a business having continually and regularly provided bus transportation services. (*See* DiMino

Aff. ¶4 ("Safe . . .has been providing bus transportation services to the [DOE] since approximately 1979.").)  Accordingly, it is part of the B&M Control Group and is jointly and severally obligated for the subject Withdrawal Liability.

Re:  Express and Transport

It is further undisputed that DiMino, the 100% owner of B&M, also owns 100% of Express and Transport (*see* Pls.' 56.1 Stmt. ¶40; Defs.' 56.1 Stmt. ¶40), thereby compelling the finding that Express and Transport are also "brother-sister" entities of B&M, rendering them under common control.  *See Frank Miceli Jr.*, 2016 WL 1275041, at *3 (collecting cases). However, there is no evidence demonstrating that, on the Withdrawal Date, either Express or Transport was a trade or business involved in an activity with any continuity and regularity such that either could also be liable for B&M's Withdrawal Liability.  *Cf., id.* at *4 (discussing the 'trade or business' requirement in determining whether withdrawal liability can be imposed on organizations other than the one obligated to the pension fund).  Indeed, the undisputed evidence put forth by the Defendants as to Express and Transport shows those entities were not continually and regularly involved in any activity on the Withdrawal Date.[8]  (*See* DiMino Aff. ¶1.) Moreover, "[t]here is no allegation that any assets of these companies were shifted or hidden in order to avoid liability."  *Dunhill*, 938 F. Supp.2d at 373 (citing *Gov't Dev. Bank of Puerto Rico v. Holt Marine Teminal, Inc.*, No. 02-cv-7825-A, 2004 WL 2062542, at *5 (E.D. Pa. Sept. 14, 2004)(noting that § 1301(b)(1) is intended to prevent companies from shifting assets in order to avoid liability)).  Thus, on the record presented, the Plaintiffs are not entitled, as a matter of law, to summary judgment in their favor on their Withdrawal Liability claims against Express and

---

[8]  The Plaintiffs did not address this component of the analysis.

Transport.

Re:  DiMino

Plaintiffs argue that "by allowing the Controlled Corporate Defendants [*i.e.*, B&M, Safe, Express, and Transport] to use the property that he owns, in his individual capacity, DiMino has made himself a member of B&M's controlled group."  (Support Memo at 17.)  They rely on *Frank Miceli Jr.*, 2016 WL 1275041, for the proposition that use alone of a property, *i.e.*, without the benefit of a lease, by a member of the B&M Control Group could bring the property's owner into the employer's common control group*, and Labarbera*, 2011 WL 1303146, for the proposition that an individual property owner may be considered part of a common control group for withdrawal liability purposes.  Defendants admit that the Rockaway Property is the principal place of business for Safe, B&M, and Express (*see* Answer ¶¶9, 8, and 12), which, it is undisputed, is owned by DiMino, solely and individually (*see* Pls.' 56.1 Stmt ¶41; Defs.' 56.1 Stmt. ¶41), and who did not receive any consideration for the use of said Property.  (*See* DiMino Aff. ¶14.)  Plaintiffs contend these admissions and undisputed facts render DiMino a member of the B&M Control Group and jointly-and severally liable for B&M's withdrawal liability.  (*See* Support Memo at 19.)

However, DiMino also declared that he "purchased the Rockaway Property as a personal real estate investment in 2002."  (DiMino Aff. ¶13.)  Relying on the Second Circuit's *UFCW Local One Pension Fund v. Enivel Properties, LLC,* 791 F.3d 369, 373 (2d Cir. 2015), DiMino argues, *inter alia*, that the Plaintiffs cannot establish the second component, *i.e.*, the "trade or business" showing, necessary to impose withdrawal liability on him.  (*See* Opposition at 19-20 (discussing *Enivel*).)

In *Enivel*, a pension fund had secured a judgment for withdrawal liability against a food-processing company ("Company"), which had one owner ("Owner"). *See* 791 F. 3d at 371. The fund sued another company, *i.e.*, Enivel, owned by Owner and his wife, alleging Enivel was a trade or business under common control with the Company such that it was jointly and severally liable for the Company's withdrawal liability. *See id.* Relying on the Supreme Court's "trade or business" dual-pronged standard articulated in *Commissioner v. Groetzinger*, 480 U.S. 23, 35 (1987), the district court determined Enivel did not meet either prong of the definition. *See id.* at 372. The fund appealed; the Second Circuit affirmed, s*ee id.* at 372, 376, explaining in part:

> In *Groetzinger*, the Court considered the meaning of the phrase "trade or business" as it appears in section 162(a) of the Internal Revenue Code. . . . *Groetzinger* is useful to "distinguish trades or business from investments, which are not trades or business and thus cannot form a basis for imputing withdrawal liability under § 1301(b)(1)." *Cent. States, Se. & Sw. Areas Pension Fund v. Fulkerson (Fulkerson)*, 238 F.3d 891, 895 (7th Cir. 2001); [(further citation omitted)]. *Groetzinger*'s construction of "trade or business" is the most helpful authoritative pronouncement available, and worthy of reliance here. Accordingly, for an activity to be a "trade or business" under section 1301(b)(1), a person or entity must engage in an activity: (1) for the primary purpose of income or profit; and (2) with continuity and regularity."

*Id.* at 373 (internal non-quoted citations omitted). The Second Circuit rejected the fund's argument that "every entity that owns investment property necessarily satisfies the first prong of *Groetzinger*," indicating, instead, that such determination must be made on a case-by-case basis. *Id.* at 374. Nor did the Circuit find clear error in the district court's conclusion that while profit may have been one reason for Enivel's buying properties, its primary purpose was personal. *See id.* at 375. As to the "regularly and continuously" prong of the *Groetzinger* "trade or business" analysis, the Circuit Court stated:

> "Possession of a property, be it stocks, commodities, leases, or
> something else, without more is the hallmark of an investment"
> and not a trade or business activity. *Fulkerson*, 238 F.3d at 895.
> "Thus, mere ownership of a property (as opposed to activities taken
> with regard to the property) cannot be considered in determining
> whether conduct is regular or continuous." *Id.* at 895-96.

*Id.* Since the fund "had not prove[n] Enivel did anything more than *de minimis* business

activities," in alignment with passive investors, the district court was "'unable to draw the

reasonable inference necessary to render a finding that any income or profit activities engaged in

by Enivel were continuous and regular.'" *Id.* (quoting the district court *Enivel* decision, No.

6:11-cv-1144, 2014 WL 2711660, at *8 (N.D.N.Y. June 16, 2014)). Finding the evidence

supported the district court's *de minimis* determination, the Circuit Court further found no clear

error in the district court's determination. *See id.* Given the undisputed facts of this case,

however, *Enivel* is distinguishable.

However, Plaintiffs' reliance on *Labarbera* and *Frank Miceli Jr.* is persuasive. In

*Labarbera*, the court found a sole proprietor ("Proprietor") of a real estate leasing business was

in common control with a withdrawing employer, which the Proprietor also solely owned. *See*

2011 WL 1303146, at 82. The withdrawing employer had used the Proprietor's property as its

principal place of business before filing for bankruptcy protection, as did a subsequently formed

and similar business formed during the pendency of the bankruptcy case. Mindful that the

purpose of ERISA § 1301 is "to prevent employers from fractionalizing and thus insulating

themselves from ERISA's requirements," the court found the Proprietor's "control and

ownership over the [p]roperty and its use as a commercial space for both the withdrawing

employer and the similar company formed in its wake . . . demonstrated that, as a matter of law,

[the Proprietor] should be considered an employer for § 1301 purposes." *Labarbera*, No. 08-cv-3274, R. & R. slip op at 17 (E.D.N.Y. Sept. 10, 2010)(citing *Swan Finishing*, 2006 WL 1292780, at *3, and *Cent. States, Se. & Sw. Areas Pension Fund v. Slotky*, 956 F.2d 1369, 1374 (7th Cir. 1992)), *modified in part and adopted in part*, 2011 WL 1303146, at *2.[9]

Pursuant to *Frank Miceli Jr.,* where a withdrawing employer *uses*, but does not lease, property from an entity under common control with the withdrawing employer, such arrangement is sufficient to make the property-owning entity a trade or business for purposes of ERISA § 1301(b)(1). *See* 2016 WL 1275041, at *7. The *Frank Miceli Jr.* court relied on a Seventh Circuit case that had "addressed this issue and stated that 'where the real estate is . . . *used* by the withdrawing employer and there is common ownership, it is improbable that the rental activity could be deemed a truly passive investment.'" *Id.* (quoting *Cent. States, Se. & Sw. Areas Pension Fund v. Messina Prods., LLC*, 706 F.3d 874, 882 (7th Cir. 2013)(explaining that "the likelihood that a true purpose and effect of the 'lease' is to split up the withdrawing employer's assets is self-evident"); emphasis added). Like the Seventh Circuit, the *Frank Miceli Jr.* court found "the absence of a 'formal lease' led to the 'inescapable conclusion . . . that the [property owner's] leasing activity was simply an extension of . . . the withdrawing employer, and was a means to fractionalize [the withdrawing employer's] assets.'" *Id.* (quoting *Messina Prods.*, 706 F.3d at 883). On those facts, the court found the commonly controlled property-owning entity

<hr>

[9] The magistrate judge's findings that (1) the Proprietor should be considered an employer for purposes of withdrawal liability and that (2) the Proprietor's sole ownership of the withdrawing employer entity and the property used by it were not objected to and the district court concurred with those findings. *See Labarbera*, 2011 WL 1303146, at *2 (citing Report & Recommendation at 16-18). The district court found the Proprietor was a member of the withdrawing employer's control group, making the Proprietor liable for the withdrawing employer's withdrawal liability. *See id.* at *4.

was a trade or business for purposes of ERISA § 1301(b)(1). *See id.; see also id.* at *6
(collecting cases stating federal courts uniformly hold that leasing property to a withdrawing
employer is a 'trade or business' for purposes of ERISA § 1301(b)(1)).

Pursuant to *Labarbera* and *Frank Miceli Jr.,* the present evidence warrants finding
DiMino liable for the Withdrawal Liability. Defendants admit that the Rockaway Property was
B&M's principal place of business (*see* Answer ¶8; *see also* Vendor Questionnaire[10] at 2, Ex. 3,
attached to Swyers Dec.), and it is undisputed that B&M received its mail at the Rockaway
Property. (Pls.' 56.1 Stmt. ¶46; Defs.' 56.1 Stmt. ¶46.) Likewise, the Rockaway Property was
where Safe received its mail (*see id.*), as well as where it conducted bus maintenance and stored
buses (Pls.' 56.1 Stmt. ¶47; Defs.' 56.1 Stmt. ¶47). Moreover, B&M identified Safe as its
"controlled entity", being located at the Rockaway Property. (*See* Vendor Questionnaire at 11.)
Indeed, as the Defendants explained, until 2013, B&M and Safe were, in essence, symbiotic
entities:

> To entice transportation providers *such as Safe* [] to continue to
> provide services to the DOE despite being forced to use costly,
> unionized bus escorts, agreement was reached with the DOE
> whereby non-asset *companies such as B&M were set-up solely as a
> means through which the escorts would be employed with respect
> to particular bus companies* at the sole expense of the DOE, who
> would fully reimburse the escort companies, such as B&M, for all
> costs related to their operation.

(Opposition at 6 (emphasis added).) It was only in 2013, when Safe was no longer required to

---

[10] The Vendor Questionnaire was first produced in the *S.D.N.Y. Litigation*. In that
action, DiMino testified he sent the Vendor Questionnaire to the DOE. (*See* DiMino *S.D.N.Y.
Litigation* Depo. Tr. 123-124, attached as Ex. 2 to Swyer Decl.) In this action, the Defendants
"[d]o not contest" that DiMino's responses on the Vendor Questionnaire on behalf of B&M
"were notarized" and that DiMino "certified his responses were 'full, complete and accurate.'"
(Pls.' 56.1 Stmt. ¶44 (citing Vendor Questionnaire); Defs.' 56.1 Stmt. ¶44.)

employ unionized bus matrons as a condition for securing bus transportation contracts with the DOE, that the corollary cessation of B&M occurred. (*See id.* at 7-8 ("With the EPPS no longer in place, Safe [] was free to utilize non-union bus matrons. There was no longer a need for B&M, which solely existed as a pass-through entity by which unionized bus matrons were utilized on DOE work . . . .").) Thus, B&M's existence was wholly dependent upon Safe's need of it, *i.e.*, but for Safe's need, B&M would not be a consideration.

"When Congress defined all members of a controlled group as a single 'employer,' it clearly intended to prevent a business from limiting its responsibilities under ERISA by the fractionalization of its business operations." *Swan Finishing*, 2006 WL 1292780, at *3 (discussion § 1301(b)(1) of ERISA) (further citations omitted)); *see also, e.g., Messina*, 706 F.3d at 882. The prudence of this approach is underscored by the *Labarbera* court's consideration of an individual property owner's control over and ownership of property used by a withdrawing employer, as well as the use by a subsequently formed and similar company. To proceed otherwise would thwart ERISA § 1301(b)(1)'s purpose.

On the record presented and given applicable case law, the use of the Rockaway Property by B&M and Safe without the benefit of a lease does not prevent finding that DiMino, as Rockaway Property 's property owner, is a "trade or business" for purpose of ERISA § 1301(b)(1). It is undisputed that: DiMino owns the Rockaway Property; on the Withdrawal Date, when B&M effectively withdrew from the Fund, B&M held out the Property as its principal place of business and had its mail sent there; Safe identifies the Rockaway Property as its principal place of business; Safe has been using the Rockaway Property location for bus maintenance work and storage; Safe receives its mail at the Rockaway Property; and neither

B&M nor Safe have a formal lease with DiMino or pay him for use of the Property. Nor can it be disputed that B&M and Safe are under common control. Additionally, while DiMino claims he owns the Rockaway Property, he made a representation on B&M's behalf that B&M owned it. (*See* Vendor Questionnaire at 2 ("c. Primary place of business address is (check all that apply)", with only the "Owned" box marked).[11]) Although the Parties have not addressed this apparent contradiction, it undermines DiMino's assertion that he held the Rockaway Property as a personal investment and lends support to the conclusion that DiMino's claiming ownership of it is a means to fractionalize B&M's and/or Safe's assets. Thus, similar to the individual owner in *Labarbera,* who was found to be a trade or business under common control for withdrawal liability purposes, *see* 2011 WL 1303146, at *3, here, since DiMino was the sole owner of both Safe-dependant B&M and Safe, which he also held out to be B&M's "controlled entity", as well as the Property used by B&M and Safe and held out to be their principal place of business, DiMino and B&M constitute a trade or business under common control for withdrawal liability purposes.

Moreover, the holding of *Frank Miceli Jr.* buttresses the Court's ruling in the instant case. *See* 2016 WL 1275041, at *6-7 (finding use of property under common control with a withdrawing entity and without a formal lease did not prevent finding the property owner to be a trade or business for purposes of § 1301(b)(1)). Here, the use of the Rockaway Property by B&M and Safe in the absence of a lease does not foreclose the conclusion that DiMino's

---

[11] B&M had the ability to indicate it used the Rockaway Property without paying to do so by checking the "Donated" box. (*See* Vendor Questionnaire at 2, Questions 1.c (listing "Owned", "Rented", and "Rented with an option to buy", as the other options to describe a vendor's "Primary place of business address")).

ownership of Rockaway Property is a trade or business for withdrawal liability purposes. To the extent necessary, the Court notes that since B&M always held out the Rockaway Property to be its principal place of business and received its mail there and Safe has done likewise, in addition to using the Property for bus maintenance and storage at all relevant times to the instant matter, the "continuity and regularity" prong of the *Groetzinger* "trade or business" test has been met.

IV.   <u>Conclusion</u>

Accordingly, IT IS HEREBY ORDERED that the Summary Judgment Motion is granted in part and denied in part, such that:

A.  Regarding the Plaintiffs' claims against B&M for Delinquent Contributions and the Audit Fee, the Fund is entitled to summary judgment in its favor and against B&M as follows:

     1.  Unpaid contributions in the amount of two thousand, nine hundred eighty-five dollars and fifty cents ($2,985.50) (hereafter, the Summary Judgment Unpaid Contribution Amount");

     2.  Interest on the Summary Judgment Unpaid Contribution Amount at a rate of eighteen percent (18%) per annum;

     3.  Liquidated damages equal to double interest on the Summary Judgment Unpaid Contribution Amount;

     4.  The Fund's reasonable attorney's fees and costs, to be determined upon further submissions to the Court; and

     5.  The Audit Fee in the amount of five thousand, eight hundred twenty-two dollars and fifty cents ($5,822.50);

B.  Regarding the Plaintiffs' claims against the Defendants B&M, Safe, and DiMino for Withdrawal Liability, the Fund is entitled to summary judgment in its favor and against B&M, Safe, and DiMino, who are jointly and severally liable for:

1.  The unpaid Withdrawal Liability in the amount of one million, two hundred three thousand, seven hundred thirty-six dollars and no cents ($1,203,736.00);

2.  Interest on the Withdrawal Liability at the Fund's custodial bank's prime rate plus two percent (2%) per annum, from the commencement of this action and which shall continue to accrue until paid;

3.  Liquidated damages in an amount of two hundred forty thousand, seven hundred forty-seven dollars and twenty cents ($240,747.20), unless and until the amount of interest exceeds this figure, at which time the amount of liquidated damages shall be double interest; and

4.  The Fund's reasonable attorney's fees and costs, to be determined upon further submissions to the Court; and

C.  Regarding the Plaintiffs' claims against the Defendants Express and Transport for Withdrawal Liability, the Fund is ***not*** entitled to summary judgment in its favor as to Express and Transport.


IT IS FURTHER ORDERED that by June 26, 2018, the Plaintiffs shall submit their application for reasonable attorney's fees and costs and a form of order in accordance with this memorandum and order for the Court's consideration.  Defendants shall have until July 31, 2018 to file a response, if any, and Plaintiffs shall have until August 24, 2018 to file a reply thereto, if

any.  If necessary, the Court will conduct a hearing in aid of judgment on October 25, 2018 at

11:15 a.m. in Courtroom 1010 of the Cental Islip Federal Courthouse.


        SO ORDERED this 29th day of May 2018 at Central Islip, New York.


                                    _/s/__Sandra J. Feuerstein__
                                    Sandra J. Feuerstein
                                    United States District Judge